Case numbers 23-1899 and 23-1946, RiethRiley Construction Co, Inc. v. National Labor Relations Board 15 minutes for the company, 10 minutes for the board, and 5 minutes for the Department of Justice Mr. Paul, you may proceed for the petitioner cross-respondent Good morning. My name is Brian Paul. I represent RiethRiley Construction and I've reserved 3 minutes for rebuttal. There are 4 issues before the court. One concerns the President's authority to terminate the NLRB General Counsel before the end of his or her 4-year term. If the court concludes that RiethRiley did not commit an unfair labor practice, it doesn't have to reach that issue. That said, given that the Presidential authority issue has long-term consequences for the independence of the board and it concerns Presidential authority generally, not just President Biden's authority, I'd hope to at least initially start there unless the court directs otherwise. However you wish. Okay, thank you. Our Presidential authority argument rests on one fundamental proposition and that is that the General Counsel must have removal protection because it is necessary to the proper functioning of the NLRB. A General Counsel who is removable at will is operationally incompatible with an independent board. It is still true under the most current Supreme Court case law dealing with the President's removal authority that Congress may provide for removal protections in one of two equally effective ways either by the express language of the statute or by the way in which Congress structures the agency. And it did not do express here. Correct. We're relying on the way in which it structured the NLRB in the relationship between the General Counsel and the board. And here Congress, as I say, structured the board in such a way that its independence depends on the General Counsel's independence. But there's a specific provision that provides protection for board members and a close by provision that does not provide that protection for the General Counsel. So why isn't that indicative that Congress didn't feel that there needed to be special protection for the General Counsel? Those provisions were enacted 12 years apart. And the Supreme Court in Gomez-Perez has suggested that it's much harder to infer something affirmative from congressional silence under those circumstances. But the one providing the protections for the board came first, right? It did. It did, correct. But it was at that time still when the Taft-Hartley Act was enacted and this General Counsel office came to be that Humphrey's executor had been decided. And in that case, the court made it clear that the way in which Congress structures an agency can create removal protections for an officer. And, in fact, at the end of that opinion, importantly, said, there remains a field of doubt in terms of the extent to which Congress can provide removal protections for people who are not purely executive officers and people who are not members of multi-member boards. And, in fact, the court in Celia Law quoted that language. And we are still within that field of doubt with the General Counsel. Uniquely, and the reason that is is because uniquely among federal agencies, NLRB orders are not self-executing. They are enforceable only if a court of appeals says they are enforceable. That is the only way a board's decision is given teeth. And here the General Counsel is in charge of seeking enforcement of the board's orders. And in so doing, the General Counsel has to act as a faithful agent. It has to seek, the General Counsel must seek enforcement of the board's orders, not only because that is what an attorney does for his or her client, but because the General Counsel cannot decide what board law should be. That's the function of the board. So can the NLRB instruct the General Counsel to seek enforcement of its order? Yes. That's under Section 10. Section 10 provides that the board has the authority to seek enforcement of its orders. Did I answer your question? Okay. Can the board instruct the General Counsel what charges to bring? No. That's an independent function covered by Section 3. The Congress set up the board and the General Counsel to have independent functions in terms of the board exercises the adjudicative function, and the General Counsel, without oversight by the board, exercises the prosecutorial function. But in between that, there's this enforcement function under Section 10 where the board is very much interdependent and dependent on the General Counsel to seek enforcement of its decisions. I thought you just answered my question to say that the board could instruct the General Counsel to seek enforcement of the board order. Yes. The enforcement function is different than the prosecutorial function. The prosecutorial function is... The initiation. Exactly. I understand that. Yeah. Okay. So, yes. So the board is very much dependent on this enforcement function that the General Counsel has. And so if the General Counsel is answerable to the President at will and must, in essence, follow the President's policy preferences, I don't want that order enforced, then the board is deprived of the independence that Congress established initially with the Act. If the board cannot seek enforcement of its orders, its orders are utterly toothless, and you have rendered its independence irrelevant. It is no longer an independent board at that point. I just want to touch on why implying removal protections is not inconsistent with the Supreme Court's most recent case law on this subject, in particular, Celia law and Collins. This case has a number of differences based on the General Counsel's function between what the General Counsel does and what the officers in those cases did. She doesn't have a separate agency. The General Counsel's office is housed within the NLRB, unlike the officers at issue in Celia law and Collins. This is not a new office with a novel configuration. This office has been around for a very long time, and there are other agencies that have presidentially appointed General Counsels. Her term is not longer than the president's term, again, a difference than the officers at issue in Celia law and Collins. Her jurisdiction is limited, and it's trained inward at the board, not outward at courts. And finally, the General Counsel's prosecutions do not automatically bind private parties, because even if the board concludes that there has been an unfair labor practice, as I explained, she has to go to court to seek enforcement of that order. That's a unique feature of the board and very much unlike what was at issue with the agencies in Celia law and Collins. Unless the court has further questions on that issue, I'll turn to the document production issues. The first issue is whether Reeth-Riley committed an unfair labor practice by not divulging the percentage of work that it subcontracts in Michigan. And the answer to that question is no, because it didn't matter whether Reeth-Riley subcontracted 1% of its work or 99% of its work. It would have made no difference to the union's bargaining position. I don't fully understand that. Can you explain why it wouldn't make a difference if there was substantial subcontracting versus de minimis? Because the union in the MUCG agreement, which is the Michigan Union Contractors Agreement, signed an agreement which had what's called a most favored nations clause in it, which says that if the union gives more favorable concessions to a contractor who is not a party to that agreement, and that would include Reeth-Riley, then it has to extend those concessions to all 170 contractors who are a party to the contract. The ALJ found that the union rejected Reeth-Riley's subcontracting proposal precisely because of the most favored nations clause, and nothing has changed in the last five years. Wouldn't it make a difference in terms of negotiation to know how much subcontracting there was, so what the union should be offering in negotiation with the employer? Well, if it would, the union and the general counsel offered no evidence to show that it would. It was their obligation to show with objective evidence that this information would have made a difference to bargaining, and they didn't do that. And the fact that it was a sticking point in the negotiations, I mean, doesn't that support that position? It doesn't because the union struck based, as the ALJ found, struck based on our subcontracting proposal because of this most favored nations clause, and it has been on strike because of that issue for the last five years, and nothing has changed in that time. So there's absolutely no evidence to indicate that whatever percentage of the work we subcontracted would have made any difference to the union. It would not have pushed it off its position. Why wouldn't you want to give this information? It seems very innocuous information what percent of your work is subcontracted. Well, because we simply didn't think it was relevant, number one. Number two, at the time that we were requested to provide this information, the union was on strike, and all of these instances of misconduct had occurred on the picket line, and we were concerned that divulging the identities of our subcontractors would lead to retaliation. Did they ask for the identities of the subcontractors, or did they just ask for the percentage of subcontractors? They had four requests for information. The general counsel charged only as to one of those, and that request asked for, for the last four years, provide any and all documents that indicate the percentage of work covered by the expired road agreement. We took that to mean that they not only wanted a number, but they wanted documents to back up that number, such as contracts that would have revealed the identity of our subcontractors. Now, it was only when the board issued its decision that we understood, at least according to the board, that all the union was entitled to was a number. So that took off the table, the clear and present danger defense. That's why we don't argue it in our briefing. We stick to relevance only. But at the time that the request was made, we were concerned that revealing the identity of these subcontractors would lead to retaliation. But wouldn't the natural response, given the requirement to produce documents, be to produce the document concerning the percentage and say that, then leave it to the union to say you haven't produced enough. We really mean that we wanted to know the identities of all the subcontractors. Well, I'm not aware of any board law that would have required that. We were permitted to take the union's at its word, that what it wanted was information about our particular subcontractor. Did you ask for clarification of that particular question? No, we didn't think we needed it. But you did ask for clarification of some other question. We did, the employee wage information request. So you knew you could ask questions if you didn't understand what was happening. Of course, but we didn't think that the subcontracting information request was ambiguous. I'll reserve the remainder of my time. Thank you. Thank you. May it please the Court. Kelly Isbell here on behalf of the National Labor Relations Board. And the Court has graciously allowed me to share five minutes of my time with Benjamin Schultz, who will be answering any questions you have about the President's removal of the Board's General Counsel. Employers have a duty to provide relevant information requested by the union. That is part of the statutory duty to bargain. And the Board found that both information requests here for subcontracting information, for wage information, were relevant and should have been provided. With regard to the subcontracting information, the standard to prove relevance is a remarkably minimal standard. The union only has to show that the information would have a probability of relevance to its collective bargaining duties. But they say there's no probability of relevance based on the multi-employer agreement, the most favored nations clause. So how does it meet even that low standard of relevance? Well, their argument feels on the facts and on the law. First of all, the union's request, the Board found that the request made a logical link between its need for the information and bargaining. The subcontracting issue had been an issue between the parties going back for years. They had bargained it at each of their bargaining sessions. They had discussed subcontracting. And the most favored nations clause is a clause that was in the expired agreement that Ruth Riley had signed on to and was currently operating under and the new agreement that my colleague mentioned, the agreement with the employers group. That subcontracting clause, or the most favored nations clause, was in both. The union asked for the subcontracting percentage, told in its request, its written request, that it's extremely important for us to know the percentage as we reply to your proposals and generate our own alternative proposals because if you subcontract only 10%, it makes a difference. It makes a large difference. Why does it make a difference? Well, that's a bargaining issue, right? But if they have this overall contract with other road contractors in Michigan, which says they have to give the same perks to everyone, if Ruth Riley is subcontracting and only subcontracting 10% of its work in two counties, then maybe the union can figure out some kind of concessions it gives to Ruth Riley to get Ruth Riley to accept its broader subcontracting proposal. Maybe the union decides that even if they grant what Ruth Riley wants, it doesn't have that big an impact on the overall contract with the other contractors. And that's something they work out in bargaining. But until the union gets that bit of information, it doesn't know what it's working with. And the union doesn't have to prove when it asks for the information, it doesn't have to prove that the information is going to result in a complete agreement or that they're going to all come to terms on a subcontracting proposal. They don't have to show that it's going to have a positive impact. They just have to show that it has a potential relevance for their bargaining. Maybe they get the information and decide they can't work it out. I mean, that's possible. But they don't know until they get the information. That's all they have to show on that, Your Honor. With regard to the wage information, Ruth Riley concedes the wage information is presumptively relevant. When you ask for wage information about people who are in the bargaining unit, the board has a presumption. It's relevant, and you provide it. Ruth Riley did not provide that information. Well, as a matter of fact, they say they sought clarification, and they were really waiting on that clarification before they could provide the wage information. They did seek clarification, Your Honor. And the union agreed. Under the expired agreement, the expired agreement defined the work jurisdiction of the union. The union agreed with them that work jurisdiction was defined in certain articles of the contract. They asked for further clarification because the union said that, at a minimum, we agree with you. These people are in the unit. What the board said is that once you know, once the union agreed with you that certain people are in the unit and they want information about people who worked under those provisions, you have to provide that information. But didn't the union in the clarification say, at a minimum? At a minimum, yes, they did, Your Honor. Would it have been enough for the employer to give the information vis-à-vis that minimum group and then wait for the union to request more information? Would that have been a proper response to the employer? It would have been a proper response, and that's what the board said they had to do. Respond to the at a minimum. If the union wants more information, they can come back and ask for it. But at a minimum, you know what you're supposed to provide, and you should give it to the union then. So hypothetically, if a union asks for information from an employer and the employer sends back, we need clarification, and the union gives gobbledygook, could the employer re-seek further clarification? Yes, Your Honor. So there wouldn't, in that hypothetical, there wouldn't be a duty to respond. Correct. The question really comes down to whether this was adequate clarification from the union in response to the employer. Correct. And the board found that on these facts it was. And we review that for substantial evidence. Yes, Your Honor. You do. You do. If the court has no further questions on the information requests, I think we'll let you give your time to your co-counsel. Thank you, Your Honor. Four additional minutes, Your Honor. Thank you. Thank you, Your Honor. Benjamin Schultz from the Department of Justice on behalf of the NLRB. As both the Ninth and the Fifth Circuits have agreed, the President may remove the General Counsel of the NLRB for any reason. And that outcome is most clear from the text of the National Labor Relations Act itself. In Section 153A, the statute very clearly gives removal protections for board members, but just a few subsections down in Subsection D, it is silent about removal for the General Counsel. And under clear Supreme Court case law, even ambiguity is normally read as not precluding the President's power to remove at will. And here we don't even have ambiguity. We have clarity in the statute as emphasized by that textual contrast. So the General Counsel has a four-year term, is that right? That's right. So isn't there arguably an implication then that the General Counsel gets to stay for four years? There is not, Your Honor. And I think there's a reason that you don't see the other side making the argument, and that's because the Supreme Court held over 100 years ago that when you have a statute that gives a term, and it was actually interpreting a statute about what were then called district attorneys, what we would now call U.S. attorneys, that actually said that you shall be appointed for a term of four years. And the Supreme Court said that that language is read to mean that that's a maximum, not that you are entitled to stay for all four years. And, in fact, Your Honor, I think it's very telling that the position that opposing counsel is taking is not once you're appointed to this position, you get to stay there for four years no matter what, a position that would have major constitutional implications. But instead their position is once you get appointed, you can only be removed for cause. So if Your Honor's view is that a four-year term implies you get to stay four years, that is not even the position that they're arguing for. So the thrust of your opponent's argument here today was that the general counsel has this role of bringing enforcement actions on behalf of the board, and therefore the general counsel has to be working for the board as opposed to for the president. How would you respond to that? So there's a number of answers to that. The first is that the Supreme Court in the UFCW case made exceptionally clear that the general counsel was very intentionally set up to be independent of the board, and the board is the adjudicator and the general counsel is the prosecutor, and the two are meant to be independent of each other. And, indeed, Your Honor, I think it's also very telling that the position that they're taking is not that the general counsel should be responsive to the board and that it can be removed by the board, but instead they have this mismatch between their theory and the implication from that theory. Under both sides' views, if the president is perfectly happy to let the general counsel sabotage the board, under both sides' interpretations of the statute, the general counsel can do that. In addition, if the president wants to make sure that the general counsel is doing everything he can or she can to do what the board wants, the president has the power to remove the general counsel if the president thinks that the general counsel isn't doing that. So it's very odd for them to somehow get from this, you know, the general counsel needs to be super responsive to the board, that the result of that is the president has only four cause removal powers. And, indeed, part of what seems so odd about their position is, number one, if you wanted the president to be really vigorous about making sure that the general counsel was responsive to the board and removing the general counsel if he or she wasn't, then you would want to give the president the most removal power you can. Their interpretation creates a chilling effect, because any time the president exercised their removal power over the general counsel, they would then have to fear that someone would challenge that, would say, you didn't have a good enough reason. Or, you know, maybe there's going to be a debate over whether you have to have notice and hearing before you can remove the general counsel, because if you look at 153A, when it talks about removal of board members, board members have to be removed upon notice and hearing. And, you know, it's unclear if under their interpretation a notice and hearing will be required before removal of the general counsel. Moreover, under their interpretation, you're going to actually increase the probability that the board and the general counsel are going to be misaligned politically. And we've explained why that is in that brief, just because of the timing, and perhaps a president who is particularly keen on manipulation might have a way to engineer a vacancy in the general counsel just before the expiration of their term. And then under the other side's interpretation, that person might be able to install a general counsel for almost the entirety of the next president's term. So it's just very odd to think that the solution that Congress had to the problem of maybe a general counsel might want to do things in appellate litigation that the board doesn't like, that you would have for-cause removal for the president. In addition, Your Honor, I think... So just out of curiosity, hypothetically, the board issues a decision ordering X, Y, and Z, and the company or entity, it could be a union or a company, that's ordered to do X, Y, and Z, says, no, we're not going to comply with your order, board. So can the board... How can the board get enforcement of that order in the courts if the general counsel will not move for enforcement? So, Your Honor, I think you're right that because of the way that the statute was set up, that board orders are not self-enforcing, that there has to be an application to a court of appeals for an order of enforcement. That's certainly right. But, again, I think the implication does not then mean that the president only has for-cause removal powers. And I think the Collins case in the Supreme Court is a great example of why this whole trying to infer from structure is a really poor way to go about in this case. In Collins, what you had was an agency that everyone agreed Congress intended to be an independent agency. And everyone believed that the head of that agency needed to have for-cause removal protections and had those protections. And so the question in Collins was, well, when you have an acting director doing the exact same duties as the head of the agency who would otherwise have for-cause removal protections, is that acting head subject to for-cause removal protections as well by implication? And the Supreme Court's clear answer was no. That's not enough of an implication to overcome the textual contrast between clear for-cause removal protections for the director and silence about the acting director. Now, if that implication wasn't enough when you had an acting director doing the exact same job as an independent agency's head, surely it's not enough to infer it in this kind of case where you have the board and the general counsel who have very, very different jobs. And indeed, the Supreme Court made that abundantly clear in the UFCW case when it talked about how the board and the general counsel were meant to be independent of each other, were meant to have these extremely different roles. I'd be happy to address any remaining questions that Your Honor has about the removal argument. If not, we'll rest on our briefs. Thank you. The general counsel is not independent of the board when it comes to the enforcement function. Section 10, by its plain text, gives the authority of the board to seek enforcement of its orders. The general counsel is duty-bound not only as an attorney but because she cannot decide what board law should be to seek enforcement of those decisions. You hit the nail on the head, Judge Moore, with your hypothetical. If the president says, I do not want that order enforced, if you seek to enforce it, general counsel, I will fire you, then you have stripped the board entirely of its independent nature. It is supposed to be, there is no question that the board is supposed to be an independent agency. And if it cannot seek enforcement of its orders in court, then it is without any power whatsoever. Companies in our position can thumb their nose at the board unless and until it gets its order enforced. That's why we're here. That's why the NLRB and the general counsel filed a cross-petition for enforcement after we filed review, because that's the only way the board's order has teeth. This was an issue that was not addressed in the Fifth and the Ninth Circuit. The focus there was not at all the enforcement function. Yes, they are independent in terms of the prosecutorial, bringing charges, and the adjudicative function. Absolutely, they are independent in that regard, as I explained earlier. But they are interdependent when we're talking about the enforcement function. This is not an odd situation. This is not a mismatch. The board cannot fire the general counsel because the Supreme Court held in Free Enterprise Fund that double-for-cause removal protections are unconstitutional. The board and board members are protected from at-will removal, right? They are independent. So if the general counsel could only be fired by someone who is protected by at-will removal, that would violate Free Enterprise Fund. Yes, the general counsel is directly answerable to the president in this circumstance, as she must be. That's the only way this can work. As to the subcontracting issue, I still have not heard an explanation as to how this information could have made a difference in bargaining, particularly in light of the entire context available to the employer, which is the standard that the board applies in this context in determining relevance. The union said it would die on the vine and burn the house down over subcontracting. And as proof of that, it has been on strike for five years now over that issue. This information would have made no difference. Thank you, Your Honors. Thank you both, all three of you, for your argument, and the case will be submitted.